UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

EDWARD GARMENDIZ,

                    Plaintiff,              17-cv-662 (JGK)

         - against -            <u>MEMORANDUM OPINION</u>
                                          <u>AND ORDER</u>
NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

                    Defendant.
_____

JOHN G. KOELTL, District Judge:

The plaintiff, Edward Garmendiz, brought this action to
reverse a final decision of the defendant, the Commissioner of
Social Security (the "Commissioner"), that the plaintiff was not
entitled to Disability Insurance Benefits ("DIB"). The plaintiff
filed an application for DIB on June 6, 2013, alleging that he
had been unable to work since October 10, 2012. His application
was denied initially on October 2, 2013. After a hearing on
March 27, 2015, an Administrative Law Judge ("ALJ") denied the
plaintiff's application on May 28, 2015, finding that the
plaintiff was not disabled. The ALJ's decision became the final
decision of the Commissioner after the Appeals Council declined
to review it on November 23, 2016. The parties have filed
cross-motions for judgment on the pleadings pursuant to Rule
12(c) of the Federal Rules of Civil Procedure.

The administrative record reflects the following facts.

The plaintiff is now 47 years old. Tr. 189. The plaintiff completed high school and attended one year of college. Tr. 48, 205. From August 1993 to October 2012, the plaintiff worked as a police officer for the New York City Police Department (the "NYPD"). Tr. 49, 205.

The plaintiff's medical history reflects recurring, severe problems with his right shoulder, neck, and spine. In 2006, the plaintiff injured his right shoulder in a car accident. Tr. 372. In July 2006, Dr. Stephen Nicholas performed a right shoulder subacromial decompression and acromioclavicular ("AC") joint reconstruction on the plaintiff. Tr. 372. After the plaintiff's pain persisted, Dr. Nicholas performed a revision surgery in September 2007. Tr. 372.

In November 2009, the plaintiff reinjured his right shoulder while arresting a resisting suspect. Tr. 374, 387. On August 19, 2011, after his symptoms had worsened, the plaintiff returned to Dr. Nicholas. Tr. 372, 387. X-rays revealed subacromial arthritis and AC joint degenerative joint disease. Tr. 387. On August 30, 2011, the plaintiff underwent an MRI of his right shoulder, which showed an intrasubstance ganglion cyst, a small tear of the posterior superior labral capsular,

and a separate tear of the inferior labrum with mild glenohumeral joint osteoarthritis. Tr. 387-88. Because of the plaintiff's severe pain and right shoulder dysfunction, Dr. Nicholas recommended arthroscopic surgery. Tr. 374, 388. On September 24, 2011, an NYPD doctor authorized the arthroscopic surgery and the plaintiff was placed on restricted duty. Tr. 388.

On October 27, 2011, the plaintiff was seen by Dr. Andrew Rokito of New York University Hospital, complaining of chronic right shoulder pain and difficulty with most activities of daily living. Tr. 374-75. Dr. Rokito assessed tenderness and palpation in the greater tuberosity and AC joint, pain with cross-chest adduction, restricted right shoulder range of motion (105/90) with pain in all directions, and pain with active compression. Tr. 375. The MRI conducted on August 30, 2011 showed rotator cuff tendinosis with an intra-muscular ganglion cyst, biceps tendinosis, posterior-superior labral tear with a paralabral cyst, an inferior labral tear, and glenohumeral osteoarthritis. Tr. 375. Dr. Rokito opined that an additional surgery on the plaintiff's right shoulder would not provide lasting relief of the plaintiff's symptoms. Tr. 375.

On November 3, 2011, the plaintiff returned to Dr. Rokito. Tr. 376. X-rays performed on October 31, 2011 showed mild productive changes at the inferior aspect of the glenoid,

3

evidence of prior distal clavicle resection, and an apparently well-preserved glenohumeral joint space. Tr. 376. Dr. Rokito again advised against an additional shoulder surgery. Tr. 376.

On December 16, 2011, the plaintiff saw Dr. Answorth Allen at the Hospital for Special Surgery, complaining of right shoulder pain and stiffness. Tr. 372. Dr. Allen's examination revealed tenderness in the AC joint, active forward flexion to 100 degrees, external rotation to 40 degrees, and internal rotation to L4. Tr. 373. Dr. Allen was not sure that a third surgery would help the plaintiff and recommended the plaintiff be seen by pain management and that treatment be focused on non-operative management, including intra-articular injections and non-steroidals. Tr. 373.

On February 7, 2012, the plaintiff returned to Dr. Rokito for a reevaluation of his shoulder pain. Tr. 377. The plaintiff had been doing physical therapy for two to three months without relief and was taking over-the-counter NSAIDs without relief of pain or stiffness. Tr. 377. The plaintiff had intermittent night pain, difficulty with most activities of daily living, and had developed tremors in his right hand. Tr. 377. Dr. Rokito assessed chronic right shoulder pain and again recommended against a third surgery. Tr. 377.

On March 12, 2012, the plaintiff saw Dr. Gerard Varlotta at the New York University School of Medicine, complaining of

severe pain of 9 on a scale of 1 to 10. Tr. 378. Dr. Varlotta noted that the plaintiff was unable to exercise due to pain, stiffness, and loss of motion, and that the plaintiff had undergone physical therapy treatments without pain improvement. Tr. 378. Dr. Varlotta assessed pain from range of motion of the right AC and glenohumeral joints, swelling in the AC joint, and tenderness on palpation. Tr. 379. The plaintiff's right shoulder had limited passive range of motion on internal rotation to L5 and external rotation of 30 degrees with severe pain. Tr. 379. By contrast, the plaintiff's left side had full range of motion without pain with forward elevation of 180 degrees, external rotation of 40 degrees, and internal rotation to approximately L1. Tr. 379. Dr. Varlotta assessed right acromioclavicular degeneration, right rotator cuff tendinitis with chronic tears, and right glenohumeral labral tear / early osteoarthritis with glenohumeral subluxation. Tr. 379. Dr. Varlotta recommended a Duexis and Flector patch for the plaintiff's pain, corticosteroid injections, physical therapy, and continued modified work duty. Tr. 379. Dr. Varlotta noted that, as of his examination, the plaintiff was unable to perform line of work duty due to pain, limited range of motion, and weakness of the right shoulder. Tr. 379.

On April 9, 2012, the plaintiff saw Dr. Kiril Kiprovsky, a neurologist, for tremors in his right hand. Tr. 380. The

5

plaintiff reported continued chronic pain and limited range of motion in his right shoulder. Tr. 380. The plaintiff experienced tremulousness in his right hand when he would try to use it, as well as numbness of his right arm in the mornings. Tr. 380. Dr. Kiprovski noted that the plaintiff would have difficulty using his right arm effectively when performing movements in the right shoulder due to pain. Tr. 380. Dr. Kiprovski reported a normal cognitive assessment, normal bulk and tone in both upper and lower extremities with mild antalgic weakness of the right arm, and postural tremor of the right hand, which subsided when the plaintiff made a fist. Tr. 381. The plaintiff's muscle stretch reflexes were 2+ in both upper and lower extremities. Tr. 381. Dr. Kiprovski assessed chronic right shoulder pain and right hand tremor, possibly related to chronic pain syndrome. Tr. 382.

On May 4, 2012, Drs. Michael Alexiades, Paul Ort, and Leon Lefner of the NYPD Pension Fund (the "Medical Board") examined the plaintiff. Tr. 386-92. The Medical Board found sufficient objective physical evidence from their examination and a review of the plaintiff's MRIs and medical records to preclude the plaintiff from performing the full duties of an NYPD officer. Tr. 391. The Medical Board found the plaintiff's active elevation of 90 degrees in the plaintiff's right shoulder compared with 180 degrees in his left, and external rotation of 10 degrees in his right shoulder compared with 30 degrees in his

left. Tr. 390. The Medical Board found one half inch of atrophy in the plaintiff's right upper arm when compared with the left at the same level. Tr. 390. The Medical Board noted that although the plaintiff had not sought medical treatment for a year and a half after his 2009 injury, its examination "clearly indicate[s] a progressive problem with the shoulder, with MRI evidence of progressive tendinosis of the rotator cuff along with progressive osteoarthritis of the glenohumeral joint." Tr. 390. The Medical Board assessed posttraumatic osteoarthritis of the right shoulder, with the January 12, 2009 line of duty injury a causal factor, and unanimously recommended approval of the plaintiff's application for Accident Disability Retirement. Tr. 391.

From February 25, 2013 to November 21, 2014, the plaintiff was also treated nine times by Dr. Michael Hearns, an occupational specialist. Tr. 397-414.

Between February 2013 and January 2015, the plaintiff was examined and treated at least eight times by Dr. Stephen Huish, a specialist in physical medicine and rehabilitation. Tr. 424-433.

On February 25, 2013, Dr. Huish examined the plaintiff. The plaintiff complained of ongoing pain, restricted range of motion, upper extremity numbness, and occasional tingling in his arms to the hand. Tr. 360. The plaintiff had difficulty

performing most activities of daily living. Tr. 360. Dr. Huish
noted flexion in the plaintiff's right shoulder of 100 degrees
with 90 degrees of abduction with marked pain and substitution,
pain and stiffness on cross-body adduction, which was limited to
15 degrees, extension up to 10 degrees, internal rotation up to
40 degrees with 50 degrees of external rotation, and marked
weakness of the supraspinatus. Tr. 360. The plaintiff had
sensory deficits in the right arm in a mixed dermatormal
distribution, equivocal Tinel and Phalen signs at the wrists,
and equivocal Tinel sign at the right elbow. Tr. 360. Dr. Huish
also noted dorsal paravertebral hypertonicity with tenderness at
L4-L5 and L5-S1 in the plaintiff's lumbar spine. Tr. 360. The
plaintiff's lumbar spine had flexion to 45 degrees with 15
degrees of extension, and his bilateral sidebending was
restricted to 10 degrees. Tr. 360. Dr. Huish recommended an
upper EMG/NCV study to evaluate further numbness and tingling.
Tr. 361.

The EMG/NCV study ordered by Dr. Huish was performed on
April 15, 2013 and showed a right C6 radiculopathy involving the
anterior primary rami with evidence of a moderate right median
entrapment neuropathy at the right wrist. Tr. 362.

On June 3, 2013, the plaintiff returned to Dr. Huish,
complaining of persistent pain in his right shoulder and neck,
and radiating pain, numbness and tingling in his right arm and

hand. Tr. 358. The plaintiff also complained of back pain with spasm and had difficulty sitting, bending, and lifting. Tr. 358. Dr. Huish noted that the plaintiff continued to have restricted cervical range of motion, mid-to-lower cervical dorsal paravertebral tenderness with spasm, and a marked trigger point on the right side at C6-C7, the bilateral upper trapezia, and the right levator scapula. Tr. 358. The plaintiff's sensory deficits in his right arm persisted, and he had mild weakness in his right biceps compared with his left. Tr. 358. The plaintiff had forward flexion to 105 degrees with 90 degrees of abduction with marked pain and substation, and pain on cross-body adduction at 10 degrees. Extension, internal, and external rotations were the same as the previous visit, and Dr. Huish noted an ongoing marked weakness at the supraspinatus. Tr. 358. The plaintiff's lumbar flexion was restricted to 40 degrees of flexion and 10 degrees of extension, and he had notable trigger points at L4-L5 and L5-S1. Tr. 358. Dr. Huish assessed right C6 radiculopathy, right median entrapment neuropathy, lumbosacral derangement, and posttraumatic myofascial pain with spasm. Tr. 358. Dr. Huish administered trigger point injections to the plaintiff's bilateral upper trapezia, right C6-C7 paravertebral musculature, and right levator scapula and recommended a cervical MRI. Tr. 358-59.

On July 27, 2013, the plaintiff underwent the cervical MRI ordered by Dr. Huish. Tr. 394. The MRI revealed posterior subligamentous disc bulging at C2/3, posterior disc bulges at C3/4 and C4/5, peripheral encroachment toward the anterior recesses and origins of the foramina, posterior subligamentous disc herniation at C5/6, posterior subligamentous disc bulging at C7/T1, and straightening of the lordosis. Tr. 394.

On September 16, 2013, the plaintiff returned to Dr. Huish to review the results of the July 27, 2013 MRI. Tr. 445. Dr. Huish examined the plaintiff and assessed right C6 radiculopathy secondary to disc herniation, right median entrapment neuropathy, lumbosacral derangement, posttraumatic myofascial pain with recurrent trigger points, and posttraumatic degenerative joint disease in the plaintiff's right shoulder. Tr. 445. Dr. Huish performed trigger point injections and recommended a consultation with a pain specialist for possible epidural injections. Tr. 445-46.

On September 26, 2013, Dr. Gilbert Jenouri evaluated the plaintiff as a consultant on behalf of the Commissioner. Tr. 366. Dr. Jenouri had not reviewed the plaintiff's medical records or any of the plaintiff's MRIs, although he reviewed the X-rays taken on September 30, 2013. The plaintiff reported continued daily pain in his back, neck, and right shoulder ranging from 8 to 10 on a scale of 1 to 10. Tr. 366. At the

time, the plaintiff was taking Aspirin, Tylenol, Ibuprofen, and Motrin without a specified frequency. Tr. 366. The plaintiff reported that his activities of daily living included watching TV, listening to the radio, and socializing with friends. Tr. 366. Dr. Jenouri assessed that the plaintiff had a normal gait, normal stance, and did not require assistance changing for the exam or getting on and off the exam table. Tr. 367. However, the plaintiff could only squat 50 percent. Tr. 367. Dr. Jenouri's examination revealed reduced range of motion of the cervical and lumbar spines and reduced range of motion in the right shoulder, elbow, and wrist. Tr. 368. Dr. Jenouri assessed neck pain, right shoulder pain, right upper extremity paresthesia, low back pain, and hypertension. Tr. 368.

On September 30, 2013, the plaintiff had X-rays of his cervical spine and right shoulder. Tr. 370, 371. The X-rays showed moderate straightening of the cervical spine and post-surgery changes in the lateral end of the clavicle in his right shoulder. Tr. 370, 371.

On October 4, 2013, the plaintiff was examined by Dr. John S. Vlattas, a pain specialist. The plaintiff complained about neck pain and stiffness in his right arm and shoulder, with numbness and tingling in his right hand. Tr. 444. Dr. Vlattas reviewed the plaintiff's prior MRIs and imaging studies. Tr. 444. Dr. Vlattas found paraspinal spam of the cervical spine,

trigger points in the right shoulder, and moderately restricted
range of motion. Tr. 444. The plaintiff's right shoulder showed
tenderness anteriorly with a moderately restricted range of
motion with pain into abduction and internal rotation,
tenderness at the AC joint, paresthesias at the right C6, and a
positive Tinel sign at the median nerve at wrist level. Tr. 444.
Dr. Vlattas assessed cervical derangement with C5-6 disc
herniation and right C6 radiculopathy, right median nerve
compression at wrist level, and a history of right shoulder
derangement with probable glenohumeral arthritis. Tr. 444.

On November 9, 2013, the plaintiff had an X-ray of his
right shoulder, which showed possible AC joint separation with
slight widening of the AC joint. Tr. 395.

On November 26, 2013, the plaintiff returned to Dr. Huish,
complaining of neck pack, radiating pain to his right arm, and
right shoulder pain with spasm and difficulty lifting, carrying,
pushing, and pulling. Tr. 442. Dr. Huish reviewed the
plaintiff's latest X-rays and the findings of Dr. Vlattas. Tr.
442. Dr. Huish noted that the plaintiff's range of motion in his
cervical spine remained restricted, and he had mid-to-lower
cervical dorsal spasm, particularly on his right side. Tr. 442.
Dr. Huish assessed C5-C6 disk herniation, right C6
radiculopathy, right wrist median nerve compression, myofascial
pain with spasm, and a history of right shoulder derangement

with glenohumeral arthritis. Tr. 442. Dr. Huish recommended continued physical therapy and a follow-up with Dr. Vlattas regarding interventional injections. Tr. 442.

On January 26, 2014, Dr. Huish examined the plaintiff and assessed restricted range of motion in the plaintiff's neck with straightening of the cervical lordosis and mid-to-lower cervical dorsal spasm, with multiple trigger points. Tr. 427. The plaintiff had cross-body adduction and tightness of the posterior capsule with weakness in his right shoulder. Tr. 427. The plaintiff also had tenderness over the AC joint and a positive Tinel and Phalen signs at the wrist with sensory deficits in a C6/median distribution. Tr. 427.

On March 3, 2014, the plaintiff returned to Dr. Huish, complaining of ongoing pain in his neck and radiating down his right arm, as well as right shoulder pain that made lifting, carrying, pushing, and pulling difficult. Tr. 440. Dr. Huish noted that the plaintiff had been diagnosed with multilevel cervical disk derangement and right carpal tunnel syndrome at the wrist and that he used a cock-up splint at night. Tr. 440. The plaintiff had not yet had any physical therapy. Tr. 440. Dr. Huish's examination revealed restricted range of motion in the cervical spine with mid-to-lower cervical dorsal spasm, particularly on the right, and straightening of the cervical lordosis with multiple trigger points. Tr. 440. Dr. Huish found

tenderness in the plaintiff's right shoulder over the anterior and lateral aspect, restricted range of motion in all planes, pain on cross-body adduction with weakness of the supraspinatus, weakness in the biceps, and persistent sensory deficits in a median C6 distribution. Tr. 440. Dr. Huish assessed multilevel cervical disk derangement, right cervical radiculopathy, right shoulder derangement with glenohumeral osteoarthrosis, right median nerve compression, and myofascial pain with spasm. Tr. 440. Dr. Huish again recommended the plaintiff see Dr. Vlattas for possible epidural injections and noted that the plaintiff had been taking Tramadol. Tr. 440. Dr. Huish also recommended a spine surgery consultation with Dr. Auerbach and that the plaintiff begin a course of physical therapy. Tr. 440. Dr. Huish noted that the plaintiff "remains disabled." Tr. 441.

On April 1, 2014, the plaintiff returned to Dr. Vlattas, complaining of neck pain, stiffness in the shoulders with numbness and tingling of the right arm to the hand, occasional mid and low back pain, and pain, weakness, and limited motion in his right shoulder. Tr. 439. Dr. Vlattas noted that the plaintiff reported pain at an 8 on a scale of 1 to 10 and that the plaintiff was limited in activities such as reaching, grasping, pushing, pulling, lifting, and carrying. Tr. 439. Dr. Vlattas' examination revealed paraspinal spasm and tenderness of the cervical spine and trigger points in the right shoulder. Tr.

439. Dr. Vlattas noted "markedly restricted range of motion."
Tr. 439. The plaintiff's right shoulder revealed crepitus with
range of motion, tenderness of the AC joint, moderately
restricted range of motion, and weakness of 4/5. Tr. 439. The
plaintiff's right wrist and hand revealed positive Tinel's sign
over the median nerve at wrist level. Tr. 439. Dr. Vlattas
assessed C5-6 herniation, right cervical radiculopathy, right
median nerve compression at wrist level, and right shoulder
derangement and glenohumeral arthritis. Tr. 439.

On April 7, 2014, the plaintiff saw Dr. Joshua Auerbach, an
orthopedic specialist at Bronx-Lebanon Hospital. The plaintiff
complained of neck pain and right arm pain with numbness and
tingling. Tr. 417. The plaintiff's pain was a 9 on a scale of 1
to 10. Tr. 417. The plaintiff had "failed" physical therapy and
medications. Tr. 417. Dr. Auerbach noted that only epidural
injections, which the plaintiff did not want, had been helpful.
Tr. 417. Dr. Auerbach's examination revealed flexion of 40/60,
extension of 30/60, and lateral bending 30/50 bilaterally in the
cervical spine. Tr. 417. Dr. Auerbach performed a motor exam,
which showed 4/5 deltoids on the right, 4/5 biceps on the right,
and 4+/5 triceps on the right. Tr. 417. Dr. Auerbach assessed
apparently work-related cervical radiculopathy, severe neural
foraminal stenosis, particularly on the right. Tr. 417. Dr.
Auerbach recommended anterior cervical fusion at C5-6. Tr. 417.

On May 5, 2014, the plaintiff returned to Dr. Huish to discuss Dr. Auerbach's recommendation for surgery and also the possibility of receiving epidural injections from Dr. Vlattas. Tr. 437. Dr. Huish noted that physical therapy had been somewhat helpful. Tr. 437. Dr. Huish noted that the plaintiff had difficulty sitting, standing, bending, carrying, and lifting, and continued to complain of radiating pain with numbness and tingling in his right hand. Tr. 437. Dr. Huish's examination revealed ongoing spasm with straightening of the cervical paravertebral musculature. Tr. 437. The plaintiff had trigger points bilaterally in the lower cervical spine and right upper trapezius. Tr. 437. Cervical flexion was 15 degrees with 10 degrees extension, right rotation was to 30 degrees with 50 degrees of left rotation. Tr. 437. The plaintiff's right shoulder revealed crepitus with restricted forward flexion and abduction, continued weakness, and a thoracic paravertebral hypertonicity with some upper thoracic spasm. Tr. 437. Dr. Huish assessed C5-C6 disk herniation, right cervical radiculopathy, right wrist median entrapment neuropathy, right shoulder derangement with glenohumeral arthritis, and thoracic myofascial pain with spasm. Tr. 437. Dr. Huish again performed trigger point injections to the plaintiff's right upper trapezius and bilateral lower cervical paravertebral musculature. Tr. 438. The plaintiff continued to weigh the options of interventional spine

injections and surgery with Dr. Auerbach, which Dr. Huish thought he would ultimately require, and planned to continue physical therapy. Tr. 437-38.

On June 10, 2014, the plaintiff returned to Dr. Vlattas, complaining of right shoulder pain and stiffness, neck pain down the right arm with numbness and tingling of the right hand, and low back pain and stiffness into the buttocks. Tr. 436. The plaintiff was taking Tramadol as needed. Tr. 436. Dr. Vlattas' examination revealed paraspinal tenderness and spasm of the cervical spine, trigger points, and restricted range of motion. Tr. 436. The plaintiff had mild spasms and tenderness with a right trunk shift in the thoracolumbar spine and tenderness of the right L5-S1 facet region with moderately restricted range of motion. Tr. 436. The plaintiff's right shoulder had tenderness anteriorly with abduction 90 degrees, anterior flexion 90 degrees, external rotation 45 degrees, internal rotation 45 degrees, and weakness at 4/5. Tr. 436. The plaintiff had paresthesias in the right C5-6 dermatomes and positive Tinel's sign over the median nerve at wrist level. Tr. 436. Dr. Vlattas assessed cervical radiculopathy, right sided. Tr. 436. The plaintiff decided to have epidural injections and to consider further surgery with Dr. Auerbach. Tr. 436.

On July 28, 2014, the plaintiff returned to Dr. Huish. Tr. 434. Dr. Huish's examination revealed decreased range of motion,

trigger points in the right cervical spine at C6-C7, upper trapezius, and right levator scapula. Tr. 434. Cervical right rotation was 30 degrees with 60 degrees of left rotation. Tr. 434. Dr. Huish found continued restricted range of motion of the right shoulder with tenderness over the anterior and lateral aspect, crepitus with weakness, tenderness with paravertebral spasm at L4-L5 and L5-S1, and flexion to 35 degrees with 10 degrees extension. Tr. 434. Dr. Huish assessed right C6 radiculopathy, history of right median entrapment neuropathy, recurrent myofascial pain with spasm and trigger points, lumbar derangement, and a history of right shoulder surgery with glenohumeral osteoarthritis and weakness. Tr. 434. Dr. Huish administered further trigger point injections. Tr. 434.

On January 19, 2015, the plaintiff returned to Dr. Huish, complaining of neck pain radiating to the shoulders, particularly on the right side, right shoulder pain with difficulty lifting, carrying, pushing, and pulling, and ongoing back pain with spasm at L4-L5 and L5-S1. Tr. 432. The plaintiff was still taking Tramadol, which the plaintiff complained made him drowsy but helped his pain. Tr. 432. The plaintiff reported continued difficulty with prolonged sitting, standing, and bending, and with any attempt at lifting. Tr. 432. Dr. Huish's examination revealed restricted cervical range of motion to 20 degrees of flexion with 15 degrees extension, restricted right

rotation to 40 degrees with 60 degrees of left rotation, and restricted bilateral sidebending. Tr. 432. The plaintiff had trigger points bilaterally at C6-C7 and in the upper trapezia, which were worse on the right side. Tr. 432. The plaintiff's right shoulder showed crepitus with restricted active flexion to 100 degrees and 95 degrees of abduction. Tr. 432. He had cross-body adduction, weakness on extension, and moderately restricted internal and external rotations. Tr. 432. The plaintiff also showed ongoing sensory loss in the right arm in a C6 distribution, with equivocal Tinel and Phalen signs at the wrists. Tr. 432. Dr. Huish assessed Right C6 radiculopathy, cervical disk derangement, right median entrapment neuropathy, posttraumatic degenerative joint disease in his right shoulder, and a lumbar sprain with posttraumatic myofascial pain and spasm. Tr. 432. Dr. Huish performed more trigger point injections and recommended that the plaintiff continue his current medications, including Tramadol, which Dr. Huish noted made the plaintiff drowsy but which the plaintiff "seems to tolerate." Tr. 433.

On January 19 and 25, 2015, Dr. Huish completed a Treating Doctor's Patient Functional Assessment To Do Sedentary Work questionnaire and narrative. Tr. 422-431. During an eight-hour workday, Dr. Huish indicated that the plaintiff could stand or walk less than two hours and sit for less than four hours. Tr.

422. Dr. Huish indicated that during an eight-hour workday the plaintiff could lift or carry between five and ten pounds for about two hours and 40 minutes and carry less than five pounds for five hours. Tr. 422. During the workday, Dr. Huish also indicated that the plaintiff required periods of bed rest and frequent breaks, and that the plaintiff suffered from work-preventing pain and required medications that interfered with his ability to function in a work setting or concentrate on his work. Tr. 423. Dr. Huish also indicated that the plaintiff required an average of two or more sick days per month and noted clinical findings of reduced range of motion, right shoulder and lumbar spasms, reduced motor strength, reduced sensation, and positive Tinel and Phalen signs. Tr. 423. Dr. Huish also summarized his treatment of the plaintiff, dating back to February 2013, in a narrative report. Tr. 424-31.

Dr. Michael Hearns also submitted a narrative report dated January 26, 2015, stating that he had treated the plaintiff from January 10, 2013 through November 21, 2014. Tr. 450-55. Dr. Hearns handwrote his treatment notes, which the parties (and the Court) were unable to decipher. See Tr. 397-414. In Dr. Hearns's typed narrative report, he reviewed the plaintiff's MRIs and other studies and the treatment records from Drs. Rokito, Answorth, Varlotta, and Kiprovski. Tr. 453-55. Dr. Hearns also reported that, based on the plaintiff's reports, the plaintiff

could walk for more than six hours and sit less than four hours in an 8-hour day, and could lift objects less than five to ten pounds for one third to two thirds of an eight-hour workday. Tr. 451. Dr. Hearns assessed cervicalgia, internal derangement of the right shoulder, and status post two right shoulder surgeries, failed right shoulder surgeries, multiple cervical herniated disc and cervical radiculopathy. Tr. 454. Dr. Hearns opined that to "a reasonable degree of medical certainty," based on the objective medical information and the plaintiff's persistent symptoms, the plaintiff was unfit to perform any job within the national job market. Tr. 454. In his professional opinion, the plaintiff's anticipated absences from work, chronic pain syndrome, and "cognitive issues" would interfere with the plaintiff's ability to perform the essential duties of any job with or without modifications. Tr. 454.

**B.**

On May 28, 2015, the ALJ issued an opinion rejecting the plaintiff's application for DIB. The ALJ concluded that the plaintiff had the severe impairments of status-post right shoulder arthroscopies in the remote past; right shoulder posttraumatic degenerative joint disease with degenerative labral tear and rotator cuff joint tendinitis; chronic pain syndrome; AC degeneration; right shoulder impingement; cervicalgia; cervical spine disc herniation and disc bulges;

21

thoracic myofascial pain; lumbar derangement; right carpal tunnel syndrome; and obesity. Tr. 30. However, the ALJ determined that the plaintiff retained the residual functional capacity ("RFC") for the full range of light work with the exception that the plaintiff could not reach overhead with his right upper extremity and could only perform occasional stooping, crouching, stair climbing, and pushing/pulling. Tr. 31. Based on the testimony of a vocational expert that there were jobs available within the national job market, even with the plaintiff's exertional restrictions, the ALJ concluded that the plaintiff was not disabled.

## II.

A court may set aside a determination by the Commissioner only if it is based on legal error or is not supported by substantial evidence in the record. See 42 U.S.C. § 405(g); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam) (citations omitted); see also Burton-Mann v. Colvin, No. 15-cv-7392, 2016 WL 4367973, at *3 (S.D.N.Y. Aug. 13, 2016). Substantial evidence is "more than a mere scintilla"; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Mejia v. Berryhill, No. 16-cv-6513, 2017 WL 3267748, at *3 (S.D.N.Y. July 31, 2017).

A claimant seeking DIB is considered disabled if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C § 423(d)(1)(A).

There is a five-step framework to evaluate disability claims set out in 20 C.F.R. § 404.1520. In essence, "if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if there is not another type of work the claimant can do." Burgess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008) (citations omitted); see also, e.g., Selian v. Astrue, 708 F.3d 409, 417–18 (2d Cir. 2013); Mejia, 2017 WL 3267748, at *4.

The claimant must first establish a disability under the Social Security Act (the framework's first four steps). See Burgess, 537 F.3d at 120. If the claimant satisfies those steps, the Commissioner must establish that, given the claimant's RFC, there is still work the claimant could perform in the national economy (the framework's fifth step). See id. If a claimant

cannot perform work in the national economy, then the claimant's condition meets the Act's definition of disability. See id.; see also Mejia, 2017 WL 3267748, at *4.[1]

### III.

In this case, the ALJ found that the plaintiff was not entitled to DIB because he was capable of performing light work with certain limitations and because jobs exist in the national economy in sufficient numbers that the plaintiff can perform. At the first step, the ALJ determined that the plaintiff had not engaged in substantial gainful activity since October 12, 2012, the date his alleged disability began. Tr. 30. At the second step, the ALJ found that the plaintiff suffered from the severe impairments of status-post right shoulder arthroscopies in the remote past; right shoulder posttraumatic degenerative joint disease with degenerative labral tear and rotator cuff joint tendinitis; chronic pain syndrome; AC degeneration; right shoulder impingement; cervicalgia; cervical spine disc herniation and disc bulges; thoracic myofascial pain; lumbar derangement; right carpal tunnel syndrome; and obesity. Tr. 30. At step three, the ALJ determined that the plaintiff did not have an impairment or combination of impairments that meets or

---

[1] The definition of "disability" and the five step decisional process is the same for DIB and for Supplemental Security Income ("SSI"), and the cases for either benefit can be used in connection with the other benefit. See, e.g., Barnhart v. Walton, 535 U.S. 212, 214 (2002).

medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 30. At step four, the ALJ found that, despite the plaintiff's severe impairments, he retains the RFC to perform the full range of light work as defined in 20 C.F.R. 404.1567(b),[2] with the added condition that the plaintiff cannot reach overhead with his right upper extremity and can only perform occasional stooping, crouching, stair climbing, and pushing/pulling. Tr. 30, 31. At step five, relying on the testimony of a vocational expert, the ALJ found that, despite the fact that the plaintiff is unable to perform his past relevant work, jobs exist in significant numbers in the national economy that the plaintiff can perform in light of his age, education, work experience, and RFC. Tr. 37-38. Specifically, the ALJ identified the jobs of Routing Clerk, Photocopy Machine Operator, Office Helper, and Order Caller. Tr. 38.

---

[2] Light work is defined by 20 CFR § 404.1567(b). "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

## A.

"[T]he 'treating physician rule' directs the ALJ to give controlling weight to the opinion of the treating physician[s] so long as [they are] consistent with the other substantial evidence." Morgan v. Colvin, 592 F. App'x 49, 50 (2d Cir. 2015) (quoting Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam)). "When other substantial evidence in the record conflicts with [a] treating physician's opinion, however, that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). Even if a treating physician's opinion is not afforded controlling weight, the Commissioner applies various factors in determining the weight to give the opinion. 20 C.F.R. § 404.1527(c). Moreover, the Commissioner is required to explain the weight it gives to the opinion of a treating physician. See id. § 404.1527(c)(2). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Dyson v. Astrue, No. 09-cv-3846, 2010 WL 2640143, at *5 (E.D. Pa. June 30, 2010) (quoting Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4 (July 2, 1996)). A district court may remand without hesitation "when the Commissioner has not provided good reasons for the weight given

to a treating physician's opinion." Morgan, 592 F. App'x at 50;
see also Mejia, 2017 WL 3267748, at *4.

In this case, without sufficient justification, the ALJ
accorded little weight to the opinions of Drs. Hearns, Huish,
and Vlattas, three of the patient's treating physicians, each of
whom had examined the plaintiff on numerous occasions. Instead,
the ALJ relied exclusively on the opinion of Dr. Jenouri, who
examined the plaintiff one time on behalf of the Commissioner,
despite the fact that Dr. Jenouri did not review crucial
objective medical evidence in the record, namely some of the
plaintiff's imaging studies, and despite the fact that Dr.
Jenouri's findings did not even support the ALJ's own findings.
This was error.

The ALJ found that the plaintiff was capable of light work
notwithstanding Dr. Hearns's opinion, which stated that to "a
reasonable degree of medical certainty," based on the objective
medical information and the plaintiff's persistent symptoms, the
plaintiff was unfit to perform any job within the national job
market because the plaintiff's anticipated absences from work,
chronic pain syndrome, and "cognitive issues" would interfere
with the plaintiff's ability to perform the essential duties of
any job with or without modifications. Tr. 454. While the
ultimate issue of "disability" is reserved for the Commissioner,
see, e.g., Snell, 177 F.3d at 133–34, specific limitations on a

27

plaintiff's ability to work are appropriate findings for medical professionals, see, e.g., Agron v. Colvin, No. 15-cv-6572, 2016 WL 4510432, at *2 (W.D.N.Y. Aug. 26, 2016).

The ALJ also determined that Dr. Hearns's report was not couched as an objective opinion and should be "viewed as essentially constituting little more than the claimant's self-reported allegations." Tr. 36. This conclusion was plainly wrong. Dr. Hearns reviewed the plaintiff's objective medical records and the reports of the plaintiff's other treating physicians in detail. Dr. Hearns specifically reviewed and evaluated EMG/NCV, MRI, and X-ray studies of the plaintiff's spine and right upper extremity. See Tr. 452-53. Dr. Hearns had also examined and treated the plaintiff on at least nine occasions. And Dr. Hearns expressly stated that his opinion was "based on the objective medical information" as well as the plaintiff's persistent symptoms. Tr. 454. Thus, Dr. Hearns based his opinion on substantial evidence in the record. The ALJ had no basis to discount Dr. Hearns's findings simply because Dr. Hearns also incorporated the plaintiff's subjective statements into his report.

The ALJ also discounted the opinion of Dr. Huish, who opined that the plaintiff was incapable of performing even sedentary work and provided specific limitations on the plaintiff's ability to sit, lift, and carry, and other

limitations based on the plaintiff's pain and need for medication. To the ALJ, it appeared that Dr. Huish "relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported." Tr. 36. That is not an accurate or fair description of Dr. Huish's report. Dr. Huish examined the plaintiff at least eight times between February 2013 and January 2015. Dr. Huish also ordered multiple imaging studies of the plaintiff, and his reports contain detailed descriptions of the objective findings of his examinations. Dr. Huish specifically stated:

> It is my opinion that the above orthopedic conditions have resulted in significant and substantial limitations in function. Mr. Garmendiz has exhibited subjective complaints of pain and dysfunction which are consistent with the multiple objective test results I have either performed or reviewed. It is also consistent with his prior surgical intervention with regard to the right shoulder. The diagnostic studies performed corroborate the patient's complaints and his persistent examination findings.
>
> . . .
>
> My opinions are based on the patient's subjective complaints and multiple physical examinations and review of the medical records noted and provided in addition to a review of the diagnostic studies performed during my care and my review of the patient's pain medicine and spine surgery consultations as noted above.

Tr. 429-30. The ALJ's reason for discounting Dr. Huish's opinion, that it was based too heavily on the plaintiff's

subjective reports, which were "uncritically accept[ed]," is not supported by the record.

The ALJ also discounted the opinions of Drs. Hearns and Huish because the plaintiff paid them for their reports. To the ALJ, "it would be reasonable to expect a doctor to provide an opinion that is not adverse to his patient's wishes when he is accepting payment to produce a document in support of disability." Tr. 36. The ALJ's determination that the medical opinions of two doctors, each of whom examined the plaintiff numerous times in the span of two years, were suspect because they were paid is unfounded. Private care providers should not be expected to provide extensive reports gratis, and there is no exception to the treating physician rule for doctors who are paid for their services.

Moreover, the ALJ erred by relying exclusively on the report of the Commissioner's consultative physician, Dr. Jenouri, to conclude that the plaintiff was capable of light work because Dr. Jenouri did not review many of the imaging studies of the plaintiff. The ALJ "accorded great weight" to Dr. Jenouri's opinion, which the ALJ found to be "very well supported by [Dr. Jenouri's own] clinical findings." Tr. 35. Yet Dr. Jenouri did not review the objective evidence in the record, including MRI and EMG/NCS studies. Thus, Dr. Jenouri's opinion was rendered without the benefit of the objective medical

evidence in the record and was therefore not entitled to the great weight afforded it by the ALJ. Burgess, 537 F.3d at 130-31 (holding that the ALJ erred by relying on the report of a physician who had not examined the plaintiff's MRI study).

Moreover, contrary to the ALJ's characterization, Dr. Jenouri's clinical findings actually supported the findings of the plaintiff's treating physicians in many ways. For example, Dr. Jenouri assessed right shoulder elevation of only 50 degrees, compared with 150 degrees for the plaintiff's left shoulder. Tr. 368. Dr. Jenouri also reported that the plaintiff's right shoulder displayed other limitations when compared with the plaintiff's left shoulder. Tr. 368.

The ALJ also improperly substituted his own opinions about the plaintiff's condition for those of the plaintiff's treating physicians. First, the ALJ determined that the plaintiff's daily activities were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." Tr. 33. That conclusion does not follow from the evidence. Rather, the plaintiff's testimony was consistent with a person who has significant limitations. The plaintiff testified that he could not do any outdoor activities, such as shoveling snow or mowing the lawn, could not do laundry, vacuum, or do housecleaning, and was essentially limited to watching T.V., reading, meditating, and "try[ing]" to clear the table after his children eat. Tr.

64. It was improper for the ALJ to conclude, based on no objective evidence in the record or expert opinion, that a person with those activities has exceeded the activities "one would expect" of someone with a disability.

The ALJ also gave "sleight weight" to his own observation that "the claimant betrayed no evidence of debilitating symptoms while testifying at the hearing." Tr. 35. While the ALJ couched this determination in terms of the plaintiff's credibility, this conclusion was contrary to the opinions of the plaintiff's treating physicians, three of whom identified significant limitations on the plaintiff's ability to work. Because "[n]either the trial judge nor the ALJ is permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion[,]" the ALJ's conclusions based on his subjective expectations of the daily activities a disabled person should be able to perform, or his evaluation of the plaintiff's appearance during the hearing, improperly displaced the opinions of the plaintiff's treating physicians. Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000).

**B.**

The ALJ also improperly discounted the plaintiff's credibility. The ALJ concluded that the plaintiff had "an excellent work history," but then questioned whether the plaintiff's "reluctance to seek employment in another less

demanding field" was due to a lack of "financial motivation to return to work" because the plaintiff reported collecting a monthly disability pension of $6,000. Tr. 34-35. Courts in this circuit have rightly found that it was improper for ALJs to discount a claimant's credibility simply because the plaintiff was receiving other disability benefits. Parikh v. Astrue, No. 07-cv-3742, 2008 WL 597190, at *8 n.10 (E.D.N.Y. Mar. 2, 2008) ("I am at a loss to understand why [the] situation [of a plaintiff with a pending application for a disability pension] is different . . . than the situation of any claimant of Social Security disability benefits"); Rinker v. Chater, No. 95-cv-3923, 1997 WL 47791, at *9 (S.D.N.Y. Feb. 6, 1997) ("The fact that an applicant for disability benefits receives other income which will be lost upon finding employment . . . by itself, does not mean that such an individual is less credible when testifying about the pain he or she suffers from a particular impairment"). Rather, the fact that the plaintiff spent nineteen years as a police officer and did not seek treatment following his multiple injuries for some time until those injuries prevented him from qualifying at the shooting range should bolster the plaintiff's credibility. See Tr. 54, 390.

The ALJ also improperly discounted the plaintiff's credibility because the plaintiff was unable to recall

immediately the name of one of his prescription medications. The ALJ specifically cited "the claimant's vague testimony regarding his medication usage" in support of the ALJ's conclusion that the plaintiff was not disabled. Tr. 37. However, the plaintiff's testimony was not vague. It simply took the plaintiff a few moments to recall the name of his medication, Tramadol. Moreover, the plaintiff's momentary lapse in recalling the name of his medication was irrelevant because the name of the medication, as well as its undesirable side effects on the plaintiff, were clearly articulated in the records of the plaintiff's treating physicians. Tr. 432, 436, 440.

### C.

Finally, the ALJ's determination that jobs exist in significant numbers in the national economy that the plaintiff was capable of performing was inconsistent with the ALJ's own determination that the plaintiff was unable to perform overhead reaching. The ALJ relied on the testimony of a vocational expert, who testified that, notwithstanding the plaintiff's undisputed inability to perform overhead reaching, the plaintiff was able to perform the requirements of a Routing Clerk, Photocopy Machine Operator, Office Helper, or Order Caller. Tr. 38, 73. However, each of these occupations requires frequent reaching. Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, U.S. Department of

Labor, Part A 98, 134, 347, 348 (1993),

http://onlineresources.wnylc.net/docs/SelectedCharacteristicsSea

rch121110.pdf ("Selected Characteristics"). While the vocational

expert based her conclusion on the expert's opinion that

"overhead reaching would not be required," Tr. 74, the Selected

Characteristics of Occupations does not distinguish between

reaching in one direction versus another. See id. C-3 (defining

"reaching" as "[e]xtending hand(s) and arm(s) in any

direction"). The vocational expert provided no basis for the

conclusion that the three specified jobs required no overhead

reaching. There was therefore no basis for the ALJ to conclude

that the plaintiff could perform the requirements of these jobs

when the ALJ also recognized that the plaintiff was unable to

perform overhead reaching. Brault v. Soc. Sec. Admin., Com'r,

683 F.3d 443, 446 (2d Cir. 2012) ("In fact, the [Dictionary of

Occupational Titles] is so valued that a [vocational expert]

whose evidence conflicts with the [Dictionary of Occupational

Titles] must provide a 'reasonable explanation' to the ALJ for

the conflict.").

In any event, there was ample evidence from the plaintiff's

treating physicians that the plaintiff was restricted from

frequent reaching with his right shoulder in any direction, not

simply overhead, and that restriction would have disqualified

the plaintiff from those jobs. See, e.g., Tr. 454 ("The

examination of the right shoulder revealed limited range of motion in all directions . . . ."); Tr. 428-29. It is unclear why the ALJ found that the plaintiff's limitations on reaching was limited to reaching overhead. That was not even a limitation found in Dr. Jenouri's report. See Tr. 369.

## CONCLUSION

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, the remaining arguments are either moot or without merit. For the foregoing reasons, the plaintiff's motion for judgment on the pleadings is **granted,** the Commissioner's cross-motion for judgment on the pleadings is **denied,** and the Commissioner's decision is **vacated,** and the case is **remanded** to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order. The Clerk is directed to enter judgment and to close this case.

**SO ORDERED.**

**Dated:**      **New York, New York**
           **June 29, 2018**

                                    **John G. Koeltl**
                          **United States District Judge**